**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| HSBC Bank USA, National Association, | Case No. 2:21-cv-00637-RFB-BNW |
| Plaintiff, | |
| v. | **Order** |
| Stewart Information Services Corporation, et al., | |
| Defendants. | |

## I.    Introduction

Pending before the Court is Plaintiff HSBC's motion to compel. ECF No. 67. Defendant Stewart opposed the motion (ECF No. 69), and Plaintiff replied (ECF No. 70). HSBC seeks to compel Stewart's Senior Vice President and Chief Underwriting Counsel (Mr. Gosdin) to answer certain questions posed at his deposition about conversations he had with Stewart's counsel and non-party Fidelity's counsel. Stewart objected to Mr. Gosdin answering these questions on the basis that they were protected by the common interest privilege. HSBC also requested Stewart and Fidelity's Common Interest Agreement, which Stewart asserted is privileged and declined to provide. For the reasons discussed below, the Court denies HSBC's motion to compel.

## II.    Background

This is one of the many HOA/lender/title insurance cases in this district. This case, like the other HOA/lender/title insurance cases, stems from allegations that in the 2000s, lenders were insured by title insurers through certain form policies for deeds of trusts. Homeowners' Associations (HOAs) foreclosed on certain properties. Quiet title actions were then brought to determine whether the lenders' deeds of trust survived the foreclosure sales. Lenders also made claims to their insurers. The insurers, in turn, determined that the lenders' claims were not covered by the form policies (or were otherwise excluded from coverage).

Here, in short, HSBC had a title insurance policy through Stewart for a particular property. When an HOA foreclosed on the property, the purchaser of the property asserted that its

interest was superior to HSBC's. This resulted in litigation between the HOA and HSBC. HSBC also made a claim to Stewart under its policies for Stewart to defend and indemnify it. Stewart largely denied HSBC's claim, and this suit followed. At bottom, the parties disagree about how Stewart's form policies should be interpreted and what they cover.

HSBC contends that the policies should be interpreted to provide coverage and, importantly, that when one looks at how the form policies are discussed in the trade, it becomes clear that Stewart's policies provide coverage in this situation. In fact, HSBC contends that Stewart's own Senior Vice President and Chief Underwriting Counsel, Mr. Gosdin, authored a publication that makes this clear. Specifically, Mr. Gosdin authored a publication for the American Bar Association called, "Title Insurance, A Comprehensive Overview." This publication discusses the form policies at issue in this case and, according to HSBC, confirms that Stewart's policies provide coverage here.

Accordingly, HSBC deposed Mr. Gosdin in this case. Mr. Gosdin disclosed that in preparing for his deposition, he had several discussions with Stewart's counsel and non-party title-insurer Fidelity's counsel. Stewart objected, however, to Mr. Gosdin answering any questions about the content of those discussions, asserting that the common interest privilege protected those communications. Stewart also stated that it entered into a Common Interest Agreement with Fidelity, which it asserted was protected by the attorney-client privilege and work product doctrine. HSBC disagreed on both fronts and now seeks to compel Mr. Gosdin to disclose the contents of his communications with Stewart and Fidelity's counsel, as well as the Common Interest Agreement.

**III.    Analysis**

There are two issues presented by HSBC's motion to compel: (1) whether the Common Interest Agreement should be produced and (2) whether Mr. Gosdin's communications with Stewart and Fidelity's counsel are protected by the common interest privilege.

1

### A.    The Common Interest Agreement

On the record before it, the Court declines to decide whether the Common Interest

Agreement is privileged. It does not appear that HSBC properly requested this document under

the Federal Rules of Civil Procedure or that Stewart has had the opportunity to respond to a

proper request under the Rules. It also appears that Stewart has not produced a privilege log

(because the document has not been properly requested). And the parties have not briefed the

issue of the whether the document is privileged based on the appropriate authority (including

whose burden it is to establish that the document is privileged and when that burden shifts based

on a privilege log).

Accordingly, HSBC may properly seek this document under the Federal Rules of Civil

Procedure. Stewart will have 14 days to respond and produce a privilege log, if appropriate. If,

after Stewart responds, the parties continue to dispute whether the document is privileged, they

must meet and confer. If they still cannot reach a resolution, HSBC may file an appropriate

motion and must discuss whose burden it is to show that the document is privileged.

### B.    The Common Interest Privilege

The parties agree that Nevada law governs whether the common interest privilege applies.

ECF No. 67 at 6, n. 1; ECF No. 69 at 7, 10. The common interest privilege is an extension of the

attorney-client privilege, which is codified at NRS § 49.095. NRS § 49.095 provides:

> A client has a privilege to refuse to disclose, and to prevent any other person from
> disclosing, confidential communications:
>
> 1. Between the client or the client's representative and the client's lawyer or the
> representative of the client's lawyer.
>
> 2. Between the client's lawyer and the lawyer's representative.
>
> 3. Made for the purpose of facilitating the rendition of professional legal services
> to the client, by the client or the client's lawyer to a lawyer representing another in
> a matter of common interest.

Nev. Rev. Stat. Ann. § 49.095 (West).

In other words, for the attorney-client "privilege to apply, the communications must be

between an attorney and client, for the purpose of facilitating the rendition of professional legal

1    services, and be confidential." *Wynn Resorts, Ltd. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*,

2    133 Nev. 369, 374 (2017). The common interest privilege protects communications made to

3    facilitate the rendition of professional legal services to the client when the communications are

4    made by the client or the client's lawyer to another lawyer representing a different client in a

5    matter of common interest. NRS § 49.095.

6         In determining whether the common interest privilege applies, the Court must engage in a

7    two-step analysis. First, the court must decide whether the information would otherwise be

8    protected by a privilege (e.g., the attorney-client privilege) but for disclosure to a third party. *See*

9    *Cotter v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 134 Nev. 247, 250-51 (2018). Second, the

10   court must decide whether disclosing the information to the third party waived the privilege. *See*

11   *id.*

12        Here, the parties dispute (1) whether Mr. Gosdin's communications with Stewart's

13   counsel are protected by the attorney-client privilege and, (2) if they are, whether the

14   communications with Fidelity's counsel waived the attorney-client privilege (or are protected by

15   the common interest privilege). The Court will address each issue in turn.

16              **i.    Whether Mr. Gosdin's Communications With Stewart's Counsel Are**
17                     **Protected By the Attorney-Client Privilege**

18        Mr. Gosdin's communications with Stewart's counsel to prepare for his deposition are

19   protected by the attorney-client privilege. The Nevada Supreme Court adopted the attorney-client

20   privilege test announced in *Upjohn* to determine which employees fall within the attorney-client

21   privilege when the client is a corporation. *Wardleigh v. Second Jud. Dist. Ct. in & for Cnty. of*

22   *Washoe*, 111 Nev. 345, 352 (1995) ("we approve the test announced in *Upjohn*"). In *Upjohn*, the

23   United States Supreme Court ruled that in the corporate context, the attorney-client privilege

24   applies to communications between corporate employees and corporate counsel for the purpose of

25   counsel being able to provide legal advice to the corporation. *Upjohn Co. v. United States*, 449

26   U.S. 383, 394 (1981); *see also United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("The

27   attorney-client privilege applies to communications between corporate employees and counsel,

28

1    made at the direction of corporate superiors in order to secure legal advice.") (citing *Upjohn*, 449
2    U.S. at 390-94).

3        Here, Mr. Gosdin satisfies the *Upjohn* test. Mr. Gosdin is a corporate employee of
4    Stewart, as its Senior Vice President and Chief Underwriting Counsel. ECF No. 67 at 2; ECF No.
5    69 at 2. During the communications at issue, he was speaking with Stewart's counsel. ECF No.
6    67 at 2, 5. The purpose of these communications was to prepare Mr. Gosdin to testify accurately
7    and in a manner that minimizes (what Stewart perceives to be) HSBC's misrepresentation of his
8    publications and opinions.[1] ECF No. 69 at 8, n. 4. These communications were undoubtedly for
9    the purpose of providing legal advice to Stewart. Accordingly, under *Upjohn*, Mr. Gosdin's
10   communications with Stewart's counsel to prepare for his deposition are protected by the
11   attorney-client privilege.

12       Contrary to HSBC's assertion, Nevada does not apply the managing-speaking agent test to
13   corporations to determine what communications are attorney-client privileged. ECF No. 67 at 8-9.
14   As previously noted, the Nevada Supreme Court adopted the *Upjohn* test for purposes of
15   determining who is subject to the attorney-client privilege in the corporate context. *Wardleigh*,
16   111 Nev. at 352 ("we approve the test announced in *Upjohn*").

17       HSBC incorrectly relies on *Palmer v. Pioneer Inn Assocs., Ltd.*, 118 Nev. 943 (2002) for
18   the proposition that the Nevada Supreme Court subsequently adopted the managing-speaking
19   agent test to determine who is a "client" for purposes of the attorney-client privilege in the
20   corporate context. ECF No. 67 at 8-9; ECF No. 70 at 4. *Palmer* explicitly answered a different
21   question: "What test does Nevada use in applying Supreme Court Rule 182 [the no-contact rule]
22   to an employee of a represented organization?" 118 Nev. at 945. The Nevada Supreme Court
23   concluded that Nevada uses the managing-speaking agent test to determine which employees
24   opposing counsel may contact at a corporation represented by counsel. *Id.* at 960 ("We conclude
25   that the managing-speaking agent test . . . best balances the policies at stake when considering
26   what contact with an organization's representatives is appropriate."). As such, *Palmer* explicitly
27   decided what test Nevada uses to determine who counsel can contact at a represented corporation

28
_____
[1] The Court expresses no opinion on HSBC's interpretations of Mr. Gosdin's opinions and publications.

1   without violating the no-contact rule; it did not decide which employees fall within the attorney-

2   client privilege at a corporation.

3          Indeed, throughout its decision in *Palmer,* the Nevada Supreme Court made it clear that

4   the test for the no-contact rule is different from the test for the attorney-client privilege. In

5   explaining its decision, the court noted that a corporate employee may not be a "party" under the

6   managing-speaking agent test but nonetheless have his communications with corporate counsel

7   protected by the attorney-client privilege. *Id.* at 961 ("[A]n employee for whom counsel has not

8   been retained does not become a 'represented party' simply because his or her conduct may be

9   imputed to the organization; while any confidential communications between such an employee

10  and the organization's counsel would be protected by the attorney-client privilege . . . ."). To put

11  an even finer point on it, the Nevada Supreme Court stated that the managing-speaking agent test

12  should be interpreted as set forth in *Wright by Wright v. Grp. Health Hosp.*, 103 Wash. 2d 192

13  (1984). *Palmer*, 118 Nev. at 960. *Wright by Wright* similarly explained that because different

14  policies animate the attorney-client privilege and the no-contact rule, "[a] corporate employee

15  who is a 'client' under the attorney-client privilege is not necessarily a 'party' for purposes of the

16  disciplinary rule." 103 Wash. 2d at 202. Accordingly, the Nevada Supreme Court only adopted

17  the managing-speaking agent test to determine who is a party for purposes of the no-contact rule;

18  it did not adopt the managing-speaking agent test for purposes of the attorney-client privilege.

19                    **ii.      Whether the Communications with Fidelity's Counsel are Protected**
20                    **By the Common Interest Privilege**

21         The parties agree that the Nevada Supreme Court has not squarely addressed the

22  requirements of the common interest privilege as codified at NRS § 49.095. ECF No. 67 at 6;

23  ECF No. 69 at 7. "Where the state's highest court has not decided an issue, the task of the federal

24  courts is to predict how the state high court would resolve it." *Giles v. Gen. Motors Acceptance*

25  *Corp.*, 494 F.3d 865, 872 (9th Cir. 2007). Accordingly, this Court must predict how the Nevada

26  Supreme Court would address whether Mr. Gosdin's communications with Stewart and Fidelity's

27  counsel are protected by the common interest privilege. One Nevada Supreme Court decision,

28

1  *Cotter v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, provides significant guidance. 134 Nev.

2  247 (2018).

3        In *Cotter*, the Court adopted the common interest privilege as it applies to the work-

4  product doctrine (as opposed to the attorney-client privilege). *Id.* at 250-251. The Nevada

5  Supreme Court provided that:

6        [f]or the common interest rule to apply, the transferor and transferee [must]
        anticipate litigation against a common adversary on the same issue or issues and
7        have strong common interests in sharing the fruit of the trial preparation efforts.
        The rule is not narrowly limited to co-parties. In addition, a written agreement is
8        not required, and common interest may be implied from conduct and situation, such
        as attorneys exchanging confidential communications from clients who are or
9        potentially may be codefendants or have common interests in litigation.

10

11 *Id.* at 250 (cleaned up). In other words, for the common interest privilege to apply to work

12 product, (1) the communicating parties must anticipate litigation (2) against a common adversary

13 (3) on the same issue or issues and (4) have a strong common interest in sharing their work

14 product. *Id.*

15        This Court sees no reason why the Nevada Supreme Court would treat the common

16 interest privilege differently in the context of the attorney-client privilege. The purpose of the

17 common interest privilege is to allow persons who share a common interest in litigation "to

18 communicate with their respective attorneys and with each other to more effectively prosecute or

19 defend their claims." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (cited by

20 *Cotter* 134 Nev. at 250). Accordingly, it makes sense that the same test would apply to determine

21 if counsel can share work product or attorney-client communications with someone who shares a

22 common interest without waiving these privileges. Put another way, it makes little sense that

23 counsel could share work product under the test outlined above to effectively litigate their claims

24 but could not discuss privileged communications for the same purpose. Accordingly, the Court

25 predicts that if the Nevada Supreme Court were to take up this issue, it would apply the test

26 announced in *Cotter* to the common interest privilege in the context of attorney-client privilege.

27        Here, Mr. Gosdin's communications with Stewart's counsel and Fidelity's counsel are

28 protected by the common interest privilege.

Regarding the first and second elements (anticipating litigation against a common adversary), the communicating parties (Stewart and Fidelity) anticipate (and are actually engaged in) litigation against a common adversary, HSBC. *See, e.g.*, *HSBC Bank USA National Association v. Fidelity National Title Group, Inc. et al.,* No. 2:18-cv-02162-MMD-DJA.

Regarding the third element (the litigation involves the same issue), these cases both involve how the form policies at issue in this litigation are discussed in the trade, which according to HSBC, confirms that the policies provide coverage to lenders for losses caused by enforcement of associations' superpriority liens. *Id.* at ECF No. 62 at 2; ECF No. 1-1 at 3. Furthermore, the complaints in both cases specifically discuss Mr. Gosdin's publications and allege that he "confirmed that ALTA 9 was intended to insure 'the priority of the lien of the Insured Mortgage over future assessments by property owner's associations.'" ECF No. 1-1 at 6; *see also HSBC Bank USA National Association v. Fidelity National Title Group, Inc. et al.,* No. 2:18-cv-02162-MMD-DJA, ECF No. 62 at 5 ("As Mr. Gosdin has explained, the ALTA 9 and its CLTA 100.2 counterpart 'insure priority of the lien of the Insured Mortgage over future assessments by property owner's associations.'").

Regarding the fourth and final issue (having a strong common interest in sharing the privileged information), both Stewart and Fidelity have a strong common interest in preparing Mr. Gosdin to testify accurately and in a manner that minimizes (what they perceive to be) HSBC's misrepresentation of his publications and opinions. *See* ECF No. 69 at 8, n.4. This is so because HSBC indicated that it intends to use Mr. Gosdin's publications and opinions about the trade against Stewart and Fidelity in the same manner. HSBC made the same allegations against both insurers in its complaints (that Mr. Gosdin's publications confirm that ALTA 9 was intended to insure the priority of lenders' liens). ECF No. 1-1 at 6; *see also HSBC Bank USA National Association v. Fidelity National Title Group, Inc. et al.,* No. 2:18-cv-02162-MMD-DJA, ECF No. 62 at 5. As a result, Stewart and Fidelity entered the Common Interest Agreement, memorializing their common legal interest and confirming that communications between the parties and their counsel related to Mr. Gosdin's deposition would be privileged. ECF No. 69 at 7. And HSBC deposed Mr. Gosdin, not because he was specifically involved in

this case,[2] but to understand his knowledge of how the form policies are interpreted in the trade. HSBC's counsel told him at his deposition, "Generally, when I ask you questions today, I'm going to be asking for your understanding of title insurance industry custom and trade usage. That's always going to be true unless I say otherwise." ECF No. 67-2 at 13:21-24. Accordingly, Stewart and Fidelity had a strong common interest in preparing Mr. Gosdin for his deposition.[3]

## IV.    Conclusion

**IT IS THEREFORE ORDERED** that HSBC's motion to compel (ECF No. 67) is DENIED.

DATED: February 13, 2023

_____
BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE

---

[2] Mr. Gosdin was not involved in denying HSBC's underlying claim. ECF No. 69 at 6.

[3] The Court declines to reach HSBC's argument that Stewart's position is an at-issue waiver, as this argument was raised for the first time in its reply. *See* ECF No. 67; ECF No. 70 at 4. However, were the Court to reach this argument, it would not find an at-issue waiver on the briefing before it. "[A]t-issue waiver occurs when the holder of the privilege pleads a claim or defense in such a way that eventually he or she will be forced to draw upon the privileged communication at trial in order to prevail . . . ." *Wardleigh v. Second Jud. Dist. Ct. in & for Cnty. of Washoe*, 111 Nev. 345, 355 (1995). HSBC argues that there is an at-issue waiver because Stewart asserted in discovery that Mr. Gosdin does not speak on its behalf. ECF No. 70 at 4. This argument does not satisfy Nevada's test.